Good morning. May it please the Court, David Neff, on behalf of the appellant, which I will refer to as the lender. I would like to reserve some time for rebuttal. How much? Three minutes. Okay. The sole issue in this case is whether the district court improperly dismissed an appeal of a planned confirmation order on equitable mootness grounds. The reorganized debtors, as the party asserting equitable mootness, bear a heavy burden to show that the lender's appeal is moot. The reorganized debtors did not sustain that burden in the district court, but that court dismissed the lender's appeal after failing to consider the limited remedies proposed by the lender. Counsel, let me ask a few questions here. We've read your materials well, and I think all my colleagues have as well. I used to do this kind of work, and I'm very familiar with mezzanine financing, and I'm interested to know a few things. Your client, I gather, is basically in the business of buying discounted notes and so on held in mezzanine property interests. Is that right? The debtor, excuse me, the lender in this case is a single-purpose entity that holds a title, in essence, to the notes, which are part of a ---- Right. In other words, you've got a group that is investing in this. Right. And what you bought was a note that was secured by the interests of the entities that previously owned the property that had no value, essentially, when they bought the note. Is that a fair statement? I don't think that's a fair statement. Well, how much was it worth? Well, I think that's ---- that would be subject to dispute and something that would have to be resolved. I agree. But the reality is, whatever the face of the note said, the collateral was worthless, right? It was not worthless. Well, what's the value of an interest in entities that are involved in ---- basically, the ---- you've got all these senior lenders ahead of them. There's nothing left in the property, is there? This issue came up before the United States Supreme Court in 1999 in the 203 North LaSalle case, where the argument was that an interest in an insolvent entity is worthless. And what the Supreme Court held is that, in fact, there is some value to having control over the case. That was the value. And that's what I wanted to get to here, is your clients obviously felt there was some value, otherwise they wouldn't have bought this, right? How much did they pay for their interest? Your Honor, I don't know how much they paid for the interest. There's nothing in the record as to how much they paid for their interest? No. Not only ---- I believe that not only is there nothing in the record, but Judge Hallowell, I believe, who was the bankruptcy judge, said that it was something that she didn't find to be something that she needed to know. I'm startled at that. I'm actually startled because we're weighing equities here. Is it fair to say that your clients paid, what were the original value of the notes here, or notes? Well, there are two issues. One is that we have the senior mortgage. Right. I'm talking about the one that you all bought. How much was the face amount of the note? I believe it was around $30 million. $30 million? Yes. Okay. And we've already talked about the fact that there was no security for that note anymore, right? Well, there was security. It was the equity interest in the entities that actually owned the two resorts. Okay. So basically, what the rights that you purchased were the rights ultimately to collect on that interest, which you would do by foreclosing, doing a UCC sale on 10 days' notice. Right. But they were in effect buying a heavily discounted note because they knew that the odds of getting anything out of that note were pretty small, except for any leverage they might be able to bring on other parties. Well, it had certain legal rights in the bankruptcy case. Right. Exactly. And the due-on-sale clause in the note is exactly the same due-on-sale clause as the one in the plan of reorganization, is it not? Well, the due-on-sale clause actually relates to the underlying mortgage. I understand that. But it is the same. It is not the same. It is or is not? It is not the same. Okay. In what way is it different? Okay. Well, there were – there are a number of differences, some small, some larger. What about the – what about the time period, the gap period? The original note? The 15-year exception wasn't in the original note, was it? The 15-year exception to the due-on-sale clause? No. Between years 5 and 10, there was a one-time – Or, sorry, 10-year exception. Right. There was a one-time right, provided that you followed certain steps and complied with certain requirements, that you were enabled to do that under the original documents. They, in essence, took advantage of the one-time right by filing bankruptcy and transferring the interest to the new equity owner, Southwest Value Partners. Is it not fair? I mean, basically, you've got Southwest Value Partners, which is a well-known buyer of these kinds of entities. You've got your folks who are well-known buyers of discounted notes. Is it fair to say that both parties are very sophisticated? First of all, I'd have to take issue with you as to our – my client being a well-known purchaser of notes. My client – Okay. They're not well-known. They're sophisticated, right? Well, they get involved in a lot of bankruptcies because the CMBS trusts and all the loans. Sure. And they invest a lot of money, and they hope to make a lot of money, right? Correct. These are not mom-and-pops. These are – these are sophisticated people. That is true. Okay. So you've got sophisticated people on your side. You've got sophisticated people on the Southwest Value Partners side. Is that fair? Right. Well, I'll give you an example. If you look at the result of what should have happened, one would only have to look at the J.E.R. Jameson case, which is a very similar case involving mezzanine loans. Went into bankruptcy with the fee-owning entities and the mezzanine entities. And the court said that for the mezzanine entities, that the debtor would never be an accepting impaired class because there's only one creditor. So it's basically a control position. The court in that case dismissed the case as having been filed in bad faith. In this case, Judge Halliwell simply overlooked the fact that there were multiple debtors in the plan and confirmed the plan because there was an accepting impaired class in one of the cases and not in all five of the cases. Let's explore this. Your, as I understand it, your client has asserted two ways in which the plan could be rewritten that would not harm anybody else. First one being a change in the due-on-sale clause. You know as a sophisticated lawyer and everybody else that deals in sophisticated real estate transactions know that the due-on-sale clause is the key to everything because they can't flip the property unless there is a void in that period. If that due-on-sale clause were changed, why would anybody, let alone Southwest Value Partners, be interested in investing in the project? Well, I mean, let's be realistic. Why would they? Well, it still could potentially be an attractive investment in the fact that they took a loan that originally was over $200 million and restructured it at $92 million. That's, they're only paying debt service on $92 million. So assume that the property continues to appreciate in value, there will be excess cash flow that they could take out, and ultimately they're going to have a property that's worth substantially more than what the debt was originally against it. Didn't the debtors argue in opposing the stay that a sale may never happen at all? Isn't that inconsistent with the idea that the whole purpose of this was to flip the property? Well, I think they argued that to show that there was no irreparable harm that was not granted a stay pending appeal. They basically said it was speculative that any sale would occur. And, in fact, they argued, contrary to their position today, they argued that the Court should not grant a stay pending appeal because it was not, it was not likely that our appeal would become equitably moot. And lo and behold, a month or two later, they filed a motion to dismiss the appeal on equitable mootness grounds. And, in fact, Judge Hollowell, in ruling on the motion for a stay pending appeal, said that she puts paramount importance to the fact that she finds any harm to the lender to be speculative. And she herself said repeatedly that it was speculative at best that this appeal would become equitably moot. Oh, she said it, and your adversary said it. That's correct. And, in fact, what happened is one month after the district court ruled, or the district within two months after the district court ruled, they then filed a motion to dismiss on equitable mootness grounds. And, in fact, they even argued to the district court back in January of 2012 that it was not likely that this appeal would become equitably moot. Your client suggested as part of this concept that nobody would be hurt. It demanded $30 million from Southwest Value Partners. Wouldn't that gut the transaction? That's what they invested in the first place to get into the deal. Well, first of all, we suggest that as one possible remedy. That would not foreclose other possible remedies. Would that be equitable? Well, I think that would be determined, you know, as a first point. Is it fair to say your clients invested a whole lot less than $30 million to buy that note? That may be true, but that's a happenstance of ---- Let's say they spent $3 million. That's a real windfall, isn't it, if they got $30 million? I would say if you look at it just that way, but I would suggest that ---- You have to, don't you? I don't think so, because most courts find that what a note buyer pays for a note is not relevant to its rights vis-a-vis ---- It is an equity. It is an equity. And we're talking about equity here, are we not? Well, we are talking about equity, but even in bankruptcy cases, I can't think of a case where a court has considered how much the purchaser has paid for a note in determining what's its rights are other than a recent case involving credibility. Isn't what the remedy would be something that would be decided on the merits if we decide this isn't moot? It seems like we might disagree with your proposed remedy, but that we don't have to only have your proposed remedy. The court could fashion any kind of remedy, right? A court could say, well, all right, so perhaps there was value to the control position. What is that value? I mean, they could say it's $1,000, and that's the remedy, right? We often value this in bankruptcy, even in solvent situations, when you determine what's the appropriate new value that you have to infuse into a debtor. And a court holds a hearing and says, all right, here is what the ownership interest is worth, and the debtor has got to put in at least that amount in order to satisfy the new value exception, the absolute priority rule. So even if the property is underwater, there's still some value to control of the enterprise. If I understand correctly, what we're going to do is determine this case based on Mortgage I and Mortgage II cases, which outline determination, correct? Yes. And I know something about Mortgage I and Mortgage II cases, so that makes me an expert. Yes, it does. If I understand correctly you're going to do this, but what I think your burden is, and you've been getting to it in a way, is whether the bankruptcy court might define a way of making modification that is equitable. That issue, of course, hasn't come back because the district court didn't get into it, but that's under the fourth factor, and that's where your argument has been going so far. I take it that you five have similar feelings about factors 1, 2, 3, that you feel they run towards the lender, but based upon all of the factors, as I understand it, what you would like to have us do is have the district court or the district court refer to the bankruptcy court to see whether or not there can be any modification. I think that the district court never even considered the two legal bases of our appeal. I think that the district court needs to do that. They have not done that at all. The bankruptcy court did determine the basis of the four factors that we've laid out in Mortgage I and Mortgage II. Right. So the first factor, obviously, we saw the State Pending Appeal. The second factor, substantial consummation of the plan has occurred, but that's not there's no presumption of mootness in the circuit. And the third factor is innocent third parties, Southwest Value Partners was active throughout the bankruptcy plan confirmation process, actively opposed the State Pending Appeal. If there are no further questions, if I could reserve the remaining time. Roberts. Thank you. By all means. With the other side, I guess just one of you is going to be arguing, right? Or are you both arguing? No. Okay. Very good. Thank you, Your Honor. Susan Boswell on behalf of the now nonexistent three prepetition debtors and the two reorganized the two reorganized debtors. If you could get into your argument, maybe you could answer a question for me. As pointed out by counsel, you or someone else representing your agent, before the Bankruptcy Court said that there's no going to be no problem at all in the future, and he outlined the state moot, which I've looked at in the record, and it's true. It seems that before the district court, the position was exactly reversed. And thank you, Your Honor. Thank you, Your Honor. Ordinarily, we say that counsel and the party can't take two different positions, that we feel that's inappropriate. Could you explain to me, and did you explain to the district judge, that you had, in fact, represented that there would be no difficulty that you're now we're contending before the district court occurred? I'd be happy to address it, Your Honor. And I would point out that the statement that was made in the argument on the state pending appeal in the Bankruptcy Court, not in the district court, in the Bankruptcy Court, had to do with the argument with respect to whether or not there would be irreparable harm when the court was evaluating the four standards that the movement had to satisfy in order to get a state pending appeal. In that context, the lender had argued that the appeal would be moved or could be moved, and that constituted irreparable harm. What I said, which was essentially, I believe, five days after confirmation, was we did not know whether or not it would be moved or it would not be moved. And if you look two pages beyond what the what the I thought I read you said it probably would not be moved. I believe what I said, Your Honor, is that these are issues that would arise in the future, and they may not even be even be moved. And I can get the transcript and read to the Court my exact statement. If you look two pages beyond that, I also said to the Court, we don't know whether it would be moved or it would not be moved. And again, this was in the context of whether or not it constituted irreparable harm. And I would differ respectfully with counsel in terms of what the Bankruptcy Court relied on, because the Bankruptcy Court relied very heavily on the fact that they had not shown irreparable harm, and more importantly, that they had not shown a likelihood of success on the merits in issuing the stay. I would also point out Can I hopefully get a clarification on this? I think the references to ER 141, the suggestion was there would be no irreparable harm. In fact, what it said was there would be no immediate harm. What what I have here is said further, there is no evidence of immediate harm with respect to the two limited partnership issues preserved by LNR, indeed, the plan's limited modifications to the ability to sell the resort subject to the loan with the ability to sell the loan complained of by LRI and LNR do not arise, if at all, until approximately January 2017. It is entirely speculative whether such a sale would ever occur. As I understand it, that was the thrust of your argument, not that there would be no irreparable harm, but it would not be immediate. Is that a fair statement? I believe, Your Honor, that that would be in part a fair statement, and I think it would also be in part a fair statement, that because wait, wait, before you put that away, I want to ask you a question about the same page. ER 141, the heading on that section says, LNR does not face irreparable harm. I don't understand how you can say you weren't arguing that they didn't face irreparable harm. In the context of the argument with respect to irreparable harm, LNR argued, and by the way, LNR is a special servicer for the lender. The lender does not – the lender is merely a trustee for bondholders. They argued that the appeal could be moot, and that constituted irreparable harm. The cases both of this Court and otherwise specifically say that mootness is not irreparable harm. And that was in that context. But could you tell us what cases – I think the cases are mixed on that question, right? I don't know that this Court has ever held that mootness is not irreparable harm. Your Honor, I believe the Enion case of the Supreme Court, and I could be wrong on that. And I thought, and I again could be wrong, that the LaVeya-Perez case had indicated that mootness would not be irreparable harm. But I could be wrong as to the specific site. With respect to the – that same issue, I would also point out to the Court that when we appeared in front of Judge Collins on the motion to dismiss for equitable mootness, the lender never raised the issue of what the Court has asked about, which is statements that were made in the context of the stay pending appeal, and whether that precluded the Court granting irreparable – I'm sorry, the Court granting the motion to dismiss for equitable mootness. I think what the Court is talking about is the potential of a judicial estoppel argument. There was never a judicial estoppel argument that was made in the court below on the motion to dismiss. And I would also point out that that argument was never made in the opening brief. Those statements were made in the reply brief when we had no opportunity to reply and fully brief those issues. Kagan. So what would be your response? I mean, so you're saying that they didn't make the argument, but say they had made the argument. What would your response have been? My response would have been exactly what my response is today to the Court, and that is it was not something that the Court relied on. It was made 5 days after confirmation in the context of whether or not mootness constituted irreparable harm for purposes of a stay pending appeal. But don't you think the Court relied on it in denying the stay? How do we know the Court didn't rely on it? Because I think that this Court can read the entirety of the transcript. This Court can read the entirety of the pleadings. Certainly, the district court heard the arguments in front of the district court and concluded exactly that. To put it in context, you had two operating debtors with properties that were in dire need of refurbishment. You had a manager, Weston Starwood, who required that new management contracts be signed by the 22nd or the 25th of January, or their agreements with Southwest Value Partners with respect to the scope of these renovations to renovate these properties for the benefit of the lender, properties that had not been renovated in 25 years, a property that was running out of cash, and creditors who had not been  And you had a party before this Court, an innocent third party, in addressing the third prong of the THORP test or mortgages, one and two. Kagan, you're calling SWVP an innocent third party? Is that who you're referring to? I am referring to SWVP as one of the innocent third parties. Should we consider them to be a third party, though? They were involved in all of these proceedings. They submitted briefs in the stay proceedings. They were part of designing the plan, correct? Why should we consider them to be a third party at all? Because SWVP is exactly the type of third party that the equitable mootness doctrine was promulgated in order to protect. If you're going to have a reorganization of a troubled business and you want a third party to come in and invest, that third party must be able to rely on the finality of the confirmation order. Otherwise, what happens is there is no ability, then, to reorganize. And with due respect, I disagree that the LaSalle case is applicable in this case because that involved old equity. This does not involve old equity coming forward to invest in this plan. This is a brand-new investor that has come forward. There are other innocent third parties that relied on the finality of this order in moving forward, Starwood. But none of those third parties would be affected by either of the claims that the lender is pressing now or the relief that they're seeking. It would just be SWVP, correct? Respectfully, Your Honor, I disagree. And the reason I disagree is the following. Southwest Value Partners, as with many third parties who come forward, they invest based upon an overall economic plan. Think of it as a table with four legs. That is what they did here. They invested based upon an economic plan. And we're not talking about $1 million or $2 million, which is, you know, a lot of money to me. We're talking $60 million-plus that they invested in order to repay not $92.5 million, but $248 million to the lender. They're going to get paid every cent that they are owed. Well, with the present value of $92, though, right? The present value of $92, but they are still going to get paid the entire amount on a property that at that time was $92.5 million. And under those circumstances, when you start chopping away at the plan, then you upset the entire economic package. And if it's going to topple over the plan, why then it doesn't work out? They've been clear on that. You can't knock the props out from underneath the plan. Do you agree that in deciding this case, what we're going to do, as your client said, we're going to take a look at Mortgage I and Mortgage II and the various factors to determine whether or not there's equitable movements? I do agree, Your Honor, and I believe you also, obviously, look at the predecessor of Thorpe. And let me tell you why I believe that this is definitely the Mortgages I case and the Mortgages II case. Yes, I knew you'd get to that. But the four factors are we eventually will have to balance all four of those. Okay. Tell me about Mortgage I and Mortgage II. Okay. And I really think that the two factors that most appropriately apply in this case are the third factor, which is whether or not there are innocent third parties that will be harmed by reversing and sending it back, and the fourth factor, which is, is there any equitable remedy that the court can impose? With respect to Mortgages I and Mortgages II, in Mortgages I, the question was, and the issue was, the fact that the prior distribution, in other words, whether or not the RepOF investors were bound by the agency agreement and that, therefore, the distributions that had already been made were somehow improvidently or improperly made. And this court found that that was equitably moot, and I suggest, based upon the fact that it would affect innocent third parties in the sense that investors, again, like Southwest Value Partners and others who had already received distributions or had relied upon what they were receiving would be adversely affected and, therefore, was moot. The difference that I believe that there was in Mortgages II is the fact that it involved a declaratory judgment action where the court improvidently, pursuant to this court's ruling, had basically, had basically, on the basis of the pleadings, incorrectly and legally incorrectly dismissed the complaint. The declaratory judgment had to do with whether or not the RepOF investors were bound at all by the agency agreement and whether ML Manager could, in fact, distribute or act on their behalf in the sale of properties and whether they were bound with these distributions. It was simply forward-looking. So you had to be able to make a decision that was in line with what was in the agreement. Kagan. But is this forward-looking as well? I mean, this 5- to 15-year exception hasn't even been triggered yet. We're not even up to the 5 years yet. That is not forward-looking, Your Honor, in the sense, again, that this was an economic package and an economic plan that was relied on in making the $60 million-plus investment. And, Your Honor, I would point out what this lender wants as their, quote, equitable remedy is for this Court to give them more than they had prior to bankruptcy. Well, let's put aside what the specific remedy is that they're asking for. Maybe the Court would come up with a different remedy, say that it is unequitable. But our question is, could there be any remedy? And I just want to go back to your — you keep saying they relied on this. But why shouldn't we follow the Pacific Lumber case from the Fifth Circuit in saying that when a sophisticated investor chooses to pursue a plan that presses the — presses legal questions that are in dispute, which they clearly knew there were two issues here that were in dispute because that was briefed up and down below, and they decide to go forward anyway, why are they not taking the risk that it could be reversed on appeal, especially when they've opposed the stay at every stage? Well, and the reason, Your Honor, is this is very different than the Pacific Lumber case. In the Pacific Lumber case, it was a matter of money that was sitting in Pacific Lumber's account, and it had to do with some of the — with some of the issues. This Court has already said that when it is a matter as between two parties that are before the Court, like the debtor and the creditor, that that does not — that does not affect third parties. In the Pacific Lumber case, you weren't talking about the investor who had invested having to pay more money, and that's the equitable remedy. And while I appreciate the fact that the Court doesn't — that this Court does not have to look at the specific remedy, what the lender has to demonstrate is that there is any remedy that could be equitable in order to — to be able to overturn what the district court did. And what they are asking and — and that's their argument. They may be claiming that they should have $30 million. Maybe we disagree. But somewhere between zero and $30 million, couldn't there be some amount of money that the Court could give as a remedy to that claim? Maybe it's $10. Why would that be unequitable? Because, Your Honor, as — as Judge Wallace — I'm sorry, Judge Smith so appropriately pointed out, in this case, it was a worthless interest. So they are not entitled to anything. And that's — that's fact. To send it back to the bankruptcy court and say, now go see if you can fashion a remedy, simply turns the equitable mootness doctrine on its ear. What it says is, if there is any — no matter how remote, no matter how, you know, if it's — if it's $1, the district court considered these issues. And in — in conclusion, because I do see that my time is up. But the district court never considered the merits of this claim. If — if — and this is a legal question. Should the voting be per debtor? Isn't this a legal question that should get resolved? And by saying this is moot, we don't get to resolve it. If — if the possible remedy could be $1, you're telling me that's so inequitable that we can't resolve the legal question in an appeal? I just don't understand how that's possible. The — the problem is that the equitable mootness doctrine exists for a purpose. The purpose is so that people, innocent third parties that are not before the Court and other parties who do business with a reorganized getter can rely on the finality of the confirmation order. If that is not the case, if this doctrine did not exist, then what you are doing is really ensuring that reorganization, which is already difficult, very difficult, to find people who are going to come in and invest. If they can't rely on the finality of the order, then you will — you will not have investors who are willing to come in and put this kind of money at risk to benefit — think of all the people who are benefited, the creditors, Starwood Weston, the customers, people who are booking their conventions, and now to say to an investor who is coming in, oh, by the way, now you get to go back to the bankruptcy court and all that you relied on in investing $60-plus million is now at risk. Well, we understand your argument there, but you have to — this is on my time. Okay. All right. In Thorpe, in Thorpe we said that if there has been an attempt to get a stay, which would have solved the problem, we wouldn't be here now. If there's an attempt to get a stay, then we have to use caution in doing equitable solvents. So when we do the caution, then we get down to the fourth factor. We don't say they can do it, they may, that is there something. You're saying there's nothing, and you don't have to be absolute because we're balancing these, but you don't concede that it's possible to make any change at all which would be equitable, having in mind the other factors, too, of the innocent parties. And, Your Honor, I always try to stay away from bright-line tests, but I think in a way that there is not an equitable remedy that can be devised that would not knock the props out from under this plan. I think what counsel has been developing is, if I understand it correctly, the due-on-sale could be modified in some fashion that would not harm, be harmful to innocent third parties. What counsel is suggesting and what the lender wants is there be a due-on-sale and no ability to assume. There's not a middle ground here. The lender got all the protections that the lender had pre-petition when the assumption was allowed. What the lender is saying to you ---- But the lender had a due-on-sale clause without this exception for no due-on-sale between years 5 and 15. Now, there's this 5 to 15-year exception. How can you say that? No, Your Honor, that's not correct. Can you point to where that exception was with the 5 to 15 years in the record before that? It is not 5 to 15. It was unlimited in the prior loan documents, and that is part of the record. That was in Judge Halliwell's ruling, so that would be the December 16th transcript when she imposed additional conditions. It also is in the exhibit, and I can get the ER, but it's in the exhibits to the confirmation order, and it's also in the pleadings with respect to the memorandum in support of confirmation of the plan. And I apologize, I don't have the ER number at my fingertips, but in there, there is a chart that sets out what the differences are in the prepetition loan documents versus what the chart is in the loan documents as presented to the court as part of confirmation. There was always the ability to sell the property subject to the loan under the prepetition loan documents. This actually shortened the period. The lender had to give approval to that sale in the original document. As they do now. They limit between years 5 to 15. No, that's not correct. I'm sorry, Your Honor. That's not correct. The lender has to approve the buyer. The buyer has to be somebody of they have to approve the financial capability of the buyer. Either the buyer has to be an experienced hotel manager or there has to be a manager of the hotel who is at least of the quality of Weston or whoever is managing the hotel at the time. There is a 1 percent fee. They have to get a title report. There also cannot be a downgrade in the bonds lower than the grading that was in existence at the time the plan was confirmed. All of those come out of the prepetition loan documents. Okay. I understand what you're saying about that. But in the prepetition loan documents, there was a due-on-sale clause, right? And now there's a due-on-sale clause with an exception for years 5 to 15. Isn't that right? No, Your Honor. I'm sorry. If the – if the – there is the option to sell the properties and pay the lender off, there is also the option to sell the property subject to during years 5 and 15. That's the same as what was in the prepetition loan documents. So where's the 5 to 15 kind of exception in the prepetition? I guess maybe if you don't have the statute. It was unlimited. And it was a one-time ability to assume. It wasn't – it was for the entire period of the loan. The 5 to 15 was a limitation that was put in for the benefit of the lender, Your Honor. Let me turn you to one that I know we've run over, but this is important to my figuring on the plane, and that has to do with Factor No. 3. If there is a parent company and a junior company, can you separate those out because of that and have one be affected and the other not be affected for purposes of balancing three? It depends, Your Honor, and I say it depends because of this reason. I think it depends on who the equity is of the reorganized company, as we have here the equity. Take Weston and Starwood. They're obviously parent and child. How are they to be treated under our Factor No. 3? I think Starwood, Weston would be treated as the same. As the same. Yes. Now, in some of the pleadings, the same lawyer or firm was appearing for some of the companies. Do we take that into effect, that they are not separate? I don't believe that any of the lawyers appeared for the same company. I appeared to always separation. That is correct, Your Honor. Our firm appeared for the debtors and then the reorganized debtors. Snell and Womer represented Southwest Value Partners and its investor funds. And the Greenberg-Traurig firm represented the Starwood-Weston entities. Okay. That's helpful. Thank you. Any other questions, colleagues? Thank you very much for your argument. Thank you. You have some time left. I think I've got two minutes left. You have one minute and 53 seconds. All right. Go for it. I would point out, just to follow up on that last point, that interestingly, in February of 2012, actually Snell and Womer filed a pleading in the case, which is on the docket that's in evidence, a motion to dismiss issues on appeal due to appellant's waiver. So they were taking an active role. They were Southwest Value Partners lawyers. They were taking a very active role until suddenly they decided we're going to seek to dismiss this on equitable mootness grounds, and then they exited the district court case. Following up on the question of the issue, well, what did Judge Holloway really rely upon in the motion for stay pending appeal? And she tells us, this is supplemental ER-454, this is a quote starting at line 4, but even if I'm wrong about that, the real reason why I'm not going to grant a stay here today is because, you know, you don't get a stay if you don't meet the irreparable harm standard. Here, the irreparable harm, the real irreparable harm that the senior lender argues about is mootness. Well, the mootness argument is speculative at best. And that's after she had heard the arguments from both the Debtor's Counsel, Ms. Boswell, as well as Southwest Value Partner, stating that they didn't think that this was going to become moot on appeal or however they phrased it. So I think that those issues were relied upon by the bankruptcy court, and they're taking a contrary position today. This case is on all fours with Pacific Lumber. This is a new investor that came in, put in $500 million. The remedy being sought was more money to be put in. They also did seek an entire overturn of the plan, which the Court said was equitably moot, but they did say it was not equitably moot, whether the new investor could be forced to put in more money. Kennedy, do you agree Pacific Lumber is a Fifth Circuit case? It doesn't bind us in any way. Of course. But it's very similar factually, a very complex reorganization with an awful lot of by parties coming in to take advantage of the bankruptcy laws, and in that case, to take over the debtor's operations, as Southwest Value Partners did here. Thank you very much. Thank you. Thank you both for good arguments. We appreciate it very much. Excellent arguments. This is a very difficult case, and I've been really helped by the oral arguments. Counsel will be to complement it. Thank you both. The case is submitted.
judges: Wallace, Smith, Friedland